UNITED STATES ex rel. Emil RECK, Relator,

v.

Joseph E. RAGEN, Respondent.

No. 57C2027.

United States District Court
N. D. Illinois, E. D.

April 28, 1959.

Latham Castle, Atty. Gen., State of Illinois, for respondent.

A. Bradley Eben, Chicago, Ill., for relator.

## CAMPBELL, Chief Judge.

The Relator, Emil Reck, was convicted of murder in the Criminal Court of Cook County, Illinois, after trial by jury in 1936, and sentenced to the Illinois State Penitentiary for a term of 199 years. At his trial, two confessions to the crime by Reck were received in evidence. At a preliminary hearing by the Court the confessions were found to be voluntary and admissible. On the trial they were again specially found to be voluntary by the jury. After conviction a Writ of Error was taken by Relator to the Illinois Supreme Court and the conviction affirmed. The Writ, however, did not raise the question of the admissibility of the confession, and thus this issue was not presented for review in that case. People v. Reck, 392 Ill. 311, 64 N.E.2d 526. Some considerable time thereafter, Relator filed a petition under the Illinois Post Conviction Hearing Act, S.H.A. ch. 38, § 826 et seq. A hearing was had by the Criminal Court of Cook County, Illinois, and relief denied. Subsequently, upon appeal, the Supreme Court of Illinois affirmed the Criminal Court's finding that no constitutional rights of the petitioner had been violated at his trial. Reck v. People, 7 Ill.2d 261, 130 N.E.2d 200. The United States Supreme Court denied Certiorari without prejudice to an application for a Writ of Habeas Corpus in an appropriate United States District Court. Reck v. People of State of Illinois, 351 U.S. 942, 76 S.Ct. 838, 100 L.Ed. 1469.

Relator then filed his petition for Writ of Habeas Corpus in this Court, the same issued, and was duly answered. At the hearing on the Writ and Answer records of all proceedings in the Courts of the State of Illinois involving Relator were received into evidence on the stipulation of the parties in open Court that said records were complete and authentic, and both sides rested. The cause is now before me for disposition on such record and on the written briefs and arguments of the parties hereto.

A summary of the facts of Relator's crime by the Supreme Court of Illinois is found on pages 262 and 263 of 7 Ill.2d, at page 201 of 130 N.E.2d, as follows:

"Dr. Peacock, a prominent Chicago pediatrician residing in an Edgewater Beach apartment, on the night of January 2, 1936, responded to a telephone call at his home to administer medical aid to a child living at 6438 North Whipple Avenue. He left his apartment but did not return. The following afternoon his lifeless body was found, drenched in blood, slumped on the rear floor of his car, parked at 6326 North Francisco Avenue, Chicago. There were thirteen deep lacerations on his head and a bullet hole passing through his brain. There were no fingerprints. There were no clues. The doctor had no enemies. The Chicago Medical Society offered a substantial reward. Every conceivable effort was made to find a solution to this mysterious brutal homicide. Daily newspaper notoriety attended the search for the guilty. Almost three months elapsed before a solution appeared in the confession obtained from four teenage boys.

"On Wednesday, March 25, 1936, petitioner, age 19, Durland Nash and Robert Goeth also 19 and Michael Livingston, age 17, were arrested on suspicion of stealing bi-

cycles. Livingston was released to his mother on Thursday and later rearrested. These boys were questioned about many robberies and burglaries and were shifted from one police station to another, being on parade at many 'show ups.' By accident these boys were questioned about the Peacock murder, and then, only after having been detained 72 hours, Durland Nash was the first to confess, implicating Goeth, Reck and Livingston. On the following Sunday, the four boys were taken to the private office of the first assistant State's Attorney Crowley to make a joint confession in the presence of a court reporter. Their statement of what transpired on the night of January 2, 1936, runs as follows:

"In the early evening of January 2, 1936, the four boys met and were riding in a Ford automobile driven by Jimmy Nash. They stopped at a Walgreen drug store somewhere on North Western Avenue. Robert Goeth and Nash got out of the car, went into the drug store, called Dr. Peacock and requested that he make a professional call on a sick child at 6438 North Whipple [Avenue]. The boys, while planning the robbery, had previously explored this neighborhood and found it to be dark and unfrequented. The two boys came back to the car and reported that their victim would be at the above address shortly, whereupon they drove there and parked their car nearby. Dr. Peacock arrived, parked his car in front of 6438, alighted from the car with his medicine case, and was approached by Robert Goeth who put a gun in his back and ordered him to re-enter his car, which he did. Livingston remained in the Ford and followed the doctor's car which was driven by Nash with Goeth sitting on his right and the petitioner with the doctor in the rear seat. After they drove some distance they ordered the doctor out of his car and demanded his money.

He said he didn't have any money and started fighting with Goeth. When Goeth got loose he fired the shots at the doctor, and while the doctor was lying on the ground breathing heavily, Reck, finished killing him with a wooden club about one foot in length that he carried as a weapon. The boys searched the doctor's pockets and found $20, divided it equally, and left him lying on the floor of the rear seat of his car. Goeth also struck him several times with the butt of his gun while he was lying on the ground. After driving away, the four separated and went their respective ways."

The record, which I have considered in the light most favorable to Relator, discloses that Emil Reck, was at the time of this horrible crime but nineteen years old. Throughout his life he had been repeatedly classified as mentally retarded and deficient by psychologists and psychiatrists of the Institute for Juvenile Research in Chicago. At one time he had been committed to an institution for the feebleminded, where he had spent a year. He dropped out of school at the age of 16, never having completed the 7th grade, and was found to have the intelligence of a child between 10 and 11 years of age at the time of his trial. Aside from his retardation, he was never a behavior problem and bore no criminal record.

Reck was arrested in Chicago without a warrant at 11:00 a. m. Wednesday, March 25, 1936, on suspicion of stealing bicycles. He was then shuttled between the North Avenue Police Station and the Shakespeare Avenue Police Station until 1:15 p. m., at which time he was returned to the North Avenue Police Station and there interrogated mainly about bicycle thefts until 6:30 or 7:00 p. m. He was then taken to the Warren Avenue Police Station where he spent the night. During this time he was fed a ham sandwich and coffee at the North Avenue Station and a bologna sausage sandwich at the North Avenue Station and a bologna

sausage sandwich at the Warren Avenue Station.

On Thursday, at 10:00 a. m., Reck was brought back to the North Avenue Station where he was interrogated some six or seven hours about various crimes in the District. Afterwards, he was sent to the Shakespeare Station and later that evening he was taken downtown to the Detective Bureau where he was exhibited at a so-called "show-up." The record does not indicate where Reck spent the night. The record shows that Reck was fed an egg sandwich and a glass of milk on Thursday but apparently nothing else.

The record is silent as to where Reck spent Friday morning but it is clear that interrogation was resumed sometime in the early afternoon. Friday evening over one hundred people congregated in the North Avenue Police Station where Reck was exhibited on the second floor. Shortly after 7:00 p. m. Reck fainted and was brought to the Cook County Hospital where he was examined by an intern who found no marks or bruises upon his body and rejected him for treatment. Reck was then taken directly back to the North Avenue Station where he was immediately again placed on exhibition. He again became sick and was taken to an unfurnished handball room, where a Sergeant Aitken, assigned to the Peacock murder investigation, questioned him about the Peacock murder for a short period of time. Reck again became sick and a Dr. Abraham was called who later testified that Reck was extremely nervous, that he was exposed and that his shirt was unbuttoned and hanging outside of his pants. He was rubbing his abdomen and complaining of pain in that region. After an examination of 60 to 90 seconds, Dr. Abraham left and Reck was questioned intermittently and exhibited to civilians until approximately 9:30 p. m. when he became ill and vomited a considerable amount of blood on the floor.

Reck was again brought to the Cook County Hospital at 10:15 p. m. on Friday where he was placed in a ward and given injections of morphine, atropine, and ipecac twice during the evening. At about 2:00 a. m. two physicians, Doctor Scatliff and Doctor Day, who were members of a Chicago Medical Society which had been assisting the police in the Peacock murder came at the request of Prosecutor Kearney to see if there were any marks of brutality on Reck. They found the door to Reck's room barred by a police officer. After securing permission from one, Police Captain O'Connell, they went in and found Reck asleep and therefore made only a cursory examination in the dark which revealed nothing conclusive. At 9:00 a. m. on Saturday, Reck told Dr. Zachary Felsher of the Cook County Hospital that the police had been beating him in the stomach. He also told Dr. Weissman of the same hospital that he had been beaten in the abdomen and chest over a three-day period. This was the first time since his arrest some 70 hours before that Reck had conversed with any civilian outside the presence of police officers. His father had attempted to see Reck on Thursday and Friday at the North Avenue Police Station and on Saturday at the Cook County Hospital. Each time he was refused.

At 9:30 a. m. on Saturday, Reck was removed from the hospital in a wheelchair and was questioned about the Peacock murder as soon as he was transferred into Captain O'Connell's car to be transported to the North Avenue Police Station, where the questioning continued until the afternoon, when he was taken to the State's Attorney's office at approximately 2:00 p. m.

Previously to this, on Friday evening, two of the boys, Nash and Goeth, who had been arrested with Reck, had confessed to the murder of Dr. Peacock, implicating Reck and one other boy, Livingston. At about 3:00 a. m. on Saturday, Livingston also agreed to sign a confession. (Upon arraignment, Livingston pleaded not guilty and alleged that he was subjected to physical abuse by the police.)

On Saturday afternoon, Reck was questioned about the whereabouts of the gun which Goeth had told police that

Reck possessed. After intensive interrogation, Reck admitted that Goeth had told him of the Peacock murder. About 4:30 p. m. in front of a group of officers and prosecutors, Reck was confronted with Nash and Goeth. Nash told the story which became his signed confession. Reck denied participation in the crime. Goeth then made the statement that Nash was telling the truth and implicated Reck. At this point Reck stated that he was present at the crime but that Livingston and not he struck Dr. Peacock.

At 5:55 p. m. of the same Saturday, March 28, 1936, a joint confession was taken, at which time Reck was very weak and sick looking. At this point, Reck had been in custody almost 80 hours without counsel, without contact with his family, without a court appearance and without charge or bail. The text of this joint confession reveals mostly yes and no answer in the case of Reck. The interrogation did not deal with the gun or the automobile used in the crime and was signed by all that Saturday night.

On Sunday, Reck was again interrogated in the State's Attorney's office and at 4:30 p. m. his individual statement was taken which was more or less a reiteration of the joint confession. The boys then washed up and were given clean clothes. Thereafter, in a formal ceremony in front of numerous officers and prosecutors as well as twelve invited civilians, the statements were read to the boys, they were duly cautioned and the confessions were then signed. The boys did not know there were civilians present and were not permitted counsel. At this time Reck had been without solid food since Friday when he had an egg sandwich. He was placed on a milk diet by the doctor Friday night at the hospital.

Reck was held in custody Monday, Tuesday and Wednesday, March 30 through April 1. Why, is not revealed in the record. On Thursday, April 2, 1936, Reck was arraigned in open court and pleaded *not guilty*. He had not seen his father or other relatives or any lawyer during this entire period. Shortly after his arraignment, Reck was treated for "kidney trouble" at the Northwestern University Clinic and on November 6, 1937, he was operated upon for a double hernia.

This cold summary of the record which is, as I have indicated, most favorable to the Relator, carries an unexpressed import of police brutality, which brutality, unfortunately, does exist in our society.

Torture of an accused is a strange circumstance of criminal procedure, which though irrational on its face, has existed for thousands of years in all manner of societies. Its first appearance in what we call modern criminal procedure seems to have occurred in France around the 13th century. At this time, France had done away with the older methods of trial such as ordeals, compurgation and trial by battle and had in effect adopted Ecclesiastical procedure which was inquisitional in form. Why torture was then added is hard to explain. Perhaps, the fact that the later Romans had used torture might have influenced this age of the Renaissance.

The Church of England, during the reign of Henry III, adopted French Ecclesiastical procedure. Under Henry VIII, the Star Chamber was established, using Ecclesiastical rules of procedure and torture was then introduced into the criminal procedure of England.

Today, unfortunately, torture of the accused is still found to varying degrees in the criminal legal systems of the world. In the Western world, this torture often takes place when the accused is in the hands of the police. Although police brutality should never be condoned, one must remember when criticizing the police that they do risk their lives daily in carrying out their duties towards society. While most of us who criticize the police have comparatively safe and pleasant environments, most policemen spend every working day dealing with dangerous criminals of every kind and in the most dismal surroundings. It is not too surprising that in

an environment of this nature, some police develop a calloused and cynical attitude toward criminals and consequently also, toward people accused of crime. Of course, this does not justify brutality. It might, however, explain why, when the police have arrested a criminal against whom there is a substantial amount of legitimate evidence tending to show his guilt in a particular crime but whom they can't get to disclose the whereabouts of a gun which would prove his guilt undeniably, they may be tempted to employ admittedly illegal "third degree" tactics to locate the gun. Or where the police suspect strongly that a person is guilty of a crime but have no evidence other than circumstantial to prove it, why again they may resort to such tactics to secure a confession, since they feel it is the only way they can convict, this, however, is little different from the situation that existed in France in the 13th century when torture was regularly employed for the same reasons.

Police today, too often feel that to work swiftly as they must, they are also required to work brutally. Pressures of society and of public opinion in one breath demand that a crime be promptly solved and in the next seem to condemn any interrogation of suspects by the police. How incongruous it is therefore to find the police attempting to protect society which can only be classified as a good and in the process committing acts of brutality which can only be classified as evil.

Evidence obtained by torture has always been regarded as being untrustworthy. As Montaigne said, torture is a "test of endurance, rather than of truth." England began to recognize this fact early in the eighteenth century excluding confessions even on lesser grounds than torture. In 1783 it was stated:

"A confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected."

K. v. Warickshall, 1 Leach Cr.C. 263, 168 Eng.Rep. 234 (1783).

During the 19th century in England, which was an age of criminal reform, there was a great suspicion of all confessions, a prejudice against them as such, and an inclination on the part of judges to repudiate them. Various tests were employed to judge the trustworthiness of a confession. The extreme was reached in a few cases which held that any confession obtained while the accused was in custody was excludable because it was untrustworthy, R. v. Baldry, 2 Den.Cr.C. 441 (1852). The tests that evolved to exclude confessions on the grounds that they are untrustworthy are not to be confused with the entirely separate principle of the privilege against self-incrimination which arose as a reaction to the "ex officio" proceedings of the Star Chamber and Ecclesiastical Courts of England. As was pointed out by the United States Supreme Court in Brown v. State of Mississippi, 297 U.S. 278, at page 285, 56 S.Ct. 461, at page 464, 80 L.Ed. 682, this privilege protects the individual from:

"The processes of justice by which the accused may be called as a witness and required to testify. Compulsion by torture to extort a confession is another matter."

Thus, the privilege against self-incrimination protects the accused from giving testimony under compulsion by making him non-compellable at his trial and by giving him the right to claim his privilege at other proceedings in which testimony is to be taken while the exclusionary rule in regard to confessions is based on the principle of untrustworthiness.

Besides these two classic principles which may be invoked in excluding a confession from evidence, the Supreme Court of the United States has more recently introduced two more principles under which a confession may also be excluded. First, a confession will be excluded from evidence if the manner in which it was procured violates the Due Process Clause of the 14th Amendment

of the United States Constitution. If confessions are procured by local or state police in such a way as to "[offend] some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental," the Due Process Clause has been violated. Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682. The second principle of exclusion introduced by the Supreme Court may be called the McNabb rule and is applicable only to Federal police tactics. In McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 613, 87 L.Ed. 819, the Supreme Court reasoned that judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining "civilized standards of procedure and evidence." Thus, in McNabb confessions were held inadmissible, irrespective of their voluntariness or the absence of coercion, because they were obtained by *federal* authorities during a period of illegal delay. The purpose of the rule is not to punish federal police or exclude untrustworthy or coerced confessions from evidence, but to eliminate the inducement to hold a suspect contrary to Title 18 U.S.C. Fed. Rules Crim.Proc. rule 5(a). See Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; Rettig v. United States, 99 U.S.App.D.C. 295, 239 F.2d 916. This is the same principle which is applied to English courts in regard to exclusion of confessions taken contrary to the "Judges' Rules."

Thus, in a federal court, confessions might be excluded from evidence on one of four grounds: (1) The privilege of self-incrimination has been violated; (2) The confession is untrustworthy; (3) The McNabb rule; (4) The Due Process Clause has been violated. In State Courts only grounds (1), (2) and (4) are applicable. Under the facts presented in this petition for Habeas Corpus involving a State Court conviction, we are confronted with a possible violation of the Due Process Clause.

Under what circumstances is the Due Process Clause violated? In Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the Due Process Clause was held violated when physical abuse was used to extort confessions. In Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, a confession after intensive interrogation violated the Due Process Clause. Both of these decisions can be interpreted in light of the classical test of untrustworthiness. However, in Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192, where the suspect had been held incommunicado for 36 hours without rest or sleep, the Court held inadmissible a confession obtained during this period and laid down a new test. Violation of the Due Process Clause was based on whether or not conditions and circumstances surrounding the making of the confession, were "inherently coercive." As Justice Jackson pointed out in his dissent (322 U.S. at page 162, 64 S.Ct. at page 930), the Court did not find as a matter of fact that the defendant's freedom of will was impaired but substituted the doctrine that the situation was "inherently coercive." In effect, the Court disregarded the issue of untrustworthiness, though it is still implicit within the term "inherently coercive" and engaged in what seems to me to be judicial legislation in state police administration, using the Due Process Clause to achieve what superficially approximates the results of the McNabb Rule.

This policy became more pronounced in Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801, where the Due Process Clause was held violated when the accused was arrested on a Wednesday and confessed on the following Tuesday after interrogation in relays. He was held without arraignment, without aid or advice, and received little food or sleep. Again, the total situation was considered but a new expression was coined, namely, the confession must be the "expression of free choice." This decision clearly indicated that "trustworthiness" is no longer the issue but rather the emphasis is shifted to police

tactics. More recently, in Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 850, 2 L.Ed.2d 975, the Court has emphasized *totality* of conduct in relation to "expression of free choice." The accused was a dull 19 year old Negro who was held incommunicado for three days with very little food and threatened with lynching. The *totality* of conduct was here held to violate the Due Process Clause. Recently, in United States ex rel. Wade v. Jackson, 256 F.2d 7, 14, the Court of Appeals for the Second Circuit in considering the treatment of a suspect similar to that in the case at bar stated:

> "This treatment, without convincing explanation of its reasonableness, is sufficient to indicate that the resulting statement was involuntary."

It can thus be seen that even the *totality* test is being expanded.

Collateral to this major development in policy, a number of other principles have been established which must be considered separately. The first is the principle that the federal courts must make an independent determination of the undisputed facts to see if the Due Process Clause has been violated. Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Thomas v. State of Arizona, 356 U.S. 390, 393, 78 S.Ct. 885, 2 L.Ed.2d 863. In Payne v. State of Arkansas, supra, the Court stated (356 U.S. at page 562, 78 S.Ct. at page 847):

> " 'The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both.' The question for our decision then is whether the confession was coerced. That question can be answered only by reviewing the circumstances under which the confession was made. We therefore proceed to examine those circumstances as shown by this record."

This statement, in effect, appears to broaden the reviewing power of federal courts beyond merely "undisputed evidence."

Secondly, is the principle that even though there be sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause. Payne v. State of Arkansas, 356 U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975.

Another collateral principle which becomes important in the instant case is that in each inquiry, the court must weigh the circumstances of pressure against the power of resistance of the person confessing. Stein v. People of State of New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522; Fikes v. State of Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246; Thomas v. State of Arizona, 356 U.S. 390, 393, 78 S.Ct. 885, 2 L.Ed.2d 863.

Therefore, beginning with the proposition that physical or psychological coercion (See Stein v. People of State of New York, 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522; Payne v. State of Arkansas, 356 U.S. 560, 561, 78 S.Ct. 844, 2 L.Ed.2d 975) will invalidate a confession and violate the due Process Clause of the Fourteenth Amendment which will in turn vitiate a judgment regardless of other evidence, the court will then determine the issue of "coercion" by an independent investigation of the *totality* of circumstances surrounding the making of the confession including the "power of resistance" [346 U.S. 156, 73 S.Ct. 1093] of the person confessing.

In analyzing the *"totality"* of circumstances surrounding the making of Reck's confession on the record before me, I find as facts:

1. Reck was a mentally retarded boy with a general weak character and no previous criminal record which might greatly affect his "power of resistance." See Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224;

2. He was held incommunicado for almost nine days and was neither allowed counsel nor informed of his

rights. See Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246;

3. He was violently ill, to the point of vomiting blood, fainted and was removed to the hospital on two occasions during his exhibition and interrogation;

4. After spending a night in the hospital where he received injections of morphine, atropine and ipecac on two occasions, he was removed in the morning by the police in a wheelchair to resume his interrogation;

5. His diet was inadequate consisting of merely a few sandwiches and milk from Wednesday until Saturday, when he confessed;

6. He was subjected to intensive interrogation from Wednesday until Saturday, when he confessed. See Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246.

7. He testified to numerous beatings in great detail;

8. He testified that he was hung from a door on several occasions by his handcuffs;

9. Nash, Goeth and Livingston corroborated his testimony of police brutality to some degree;

10. Dr. Abraham found Reck in the handball room with his shirt out, his pants undone, and exposed. There was a pool of blood on the floor;

11. At his first opportunity, on Saturday morning in the hospital, Reck told two doctors that the police had beaten him;

12. Shortly after his arraignment, he was treated for kidney trouble and later he was operated upon for a double hernia;

13. He was very sick and weak looking when he signed the joint confession;

14. Other than his own confession, the confessions of Goeth, Nash and Livingston tend to prove the crime against Reck.

In reviewing this case at this late date, however, it should be remembered that the first *coerced* confession case under the Due Process Clause, Brown v. State of Mississippi, supra, was decided in 1936 after Reck's confession, and just three months before his case went to trial. In the Brown case physical coercion was clearly and undeniably proved though the Court stated broadly that: "The state is free to regulate the procedure of its courts in accordance with its own conceptions of policy, unless in so doing it 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental'." Supra, 297 U.S. at page 285, 56 S.Ct. at page 464. Therefore, at the time Reck was tried, a violation of the Due Process Clause was necessarily predicated upon a clear showing of physical coercion according to the decision of the Supreme Court in the Brown case. The Brown case can be interpreted in light of the classical doctrine of exclusion based on trustworthiness since the test used was based on a clear showing of physical coercion. The test of exclusion used in Reck's case is as follows:

"The Law in this state is that the burden is on the People to establish by a preponderance of the evidence that a confession or what is introduced as a confession was made voluntarily and freely. If there was any coercion or promise of immunity or reward for making the confession, or if the person making the confession was abused in any way either by striking or threatening or any form of mental or physical abuse, then the confessions would not be free and voluntary confessions." (People v. Reck, Criminal Court of Cook County, No. 36–0459).

It is clearly seen that this test is also based upon the classical doctrine of untrustworthiness. The importance of these two tests is that in both instances, the coercion *itself* has to be proved as a matter of fact and will not be *implied*

from surrounding circumstances. Therefore, at Reck's trial the Due Process Clause could not have been held to be violated since the test employed by the Supreme Court in the Brown case and the test employed at Reck's trial both required that coercion be proved in *fact*, which was not possible from the evidence as shown by the records.

It was in 1945, nine years later, when Reck brought Writ of Error to the Supreme Court of Illinois on the common law record. By this time Chambers v. State of Florida, supra, decided in 1940, had extended the Brown decision to cases of mental coercion *proved in fact*, while in 1944, the Supreme Court had decided the case of Ashcraft v. State of Tennessee, supra. It was this momentous decision that laid down a new test which went beyond the Brown case and Chambers came in holding the Due Process Clause violated by "inherently coercive" circumstances instead of requiring that the coercion be proved in fact. Therefore in 1944, Reck and many other state convicts, were suddenly presented with a new exclusionary principle under which the circumstances surrounding their confessions could be held to violate the Due Process Clause. Reck was precluded from raising the constitutional questions concerning his confession by way of Writ of Error on the common law record and so sought other means to bring the issue before the courts.

When the post-conviction trial court on May 1, 1953 denied Reck's petition under the Illinois Post-Conviction Hearing Act wherein he properly raised the constitutional questions concerning his confession, there were many United States Supreme Court decisions, including Watts v. State of Indiana, supra (decided in 1949), which emphasized the *totality* of circumstances as the test for a violation of the Due Process Clause. Yet, not one of these decisions or the test for a violation of the Due Process Clause, as stated by the United States Supreme Court, was mentioned in the trial court's opinion.

On November 23, 1955, the Supreme Court of Illinois affirmed the judgment of the post-conviction trial court in an interesting and revealing decision. Reck v. People, 7 Ill.2d 261, 130 N.E.2d 200. First, the Supreme Court of Illinois neither referred to a single decision of the United States Supreme Court discussing the test which looks to the *totality* of circumstances and not to the actual coercion itself to establish a violation of the Due Process Clause, nor even admitted that such a test exists. Instead, the Court engaged in a long dissertation involving the facts of the crime as set out by the confessions and then after commenting briefly on the fact that Reck was mentally retarded and bore no previous criminal record, it summarized the circumstances surrounding Reck's confession.

An analysis of this decision reveals the following basic reasons leading to the Court's conclusion, to each of which I add in parenthesis my comments:

1. The original trial judge and jury found the confession was voluntary (*Since it has been pointed out that the test employed by the trial court was based upon the classical doctrine of untrustworthiness which required a showing of coercion in fact, this argument is not pertinent because the present test employed by the Supreme Court looks to "totality" of circumstances to establish a violation of the Due Process Clause.*)

2. The first three days of Reck's confinement were devoted entirely to questioning about crimes independent of the Peacock murder. (*This argument is of little merit since intensive interrogation itself, regardless of its object, has a coercive and psychological effect after a certain period of time.*)

3. The police denied categorically all charges of abuse. (*If there had been brutality, the police would not be quick to admit it since then not only would the confession have been barred but the police would also have been guilty of a felony.*)

4. Six doctors and other witnesses testified that Reck exhibited no

signs of abuse. (*This argument first avoids the issue of psychological coercion and then overlooks the fact that Reck was hemorrhaging, vomiting and fainting, which doctors testified could have been caused by blows without causing any skin discoloration.*)

5. The record shows that when the boys signed the confession they did so freely, voluntarily and without any promise of reward; that they had read the statement over, and that the boys stated it contained the truth. (*This again pertains to the actual signing of the confession in formal proceedings and does not satisfy the United States Supreme Court test which demands that the total circumstances be considered.*)

Upon these reasons, which I cannot accept, the Supreme Court of Illinois makes this concluding statement [7 Ill. 2d 261, 130 N.E.2d 203]: "We are of the opinion that petitioner's constitutional rights were not infringed under the facts as disclosed by the record in this case."

The questions immediately arise as to why the Court did not consider any of the United States Supreme Court cases or the test employed for violation of the Due Process Clause. Certainly, the Court was aware of these decisions and the test and yet it made no mention of either. I believe the reason becomes evident in the two pages devoted to describing the brutal murder of Dr. Peacock. This recitation appears to be in justification of the conclusion: "The statements signed by the boys are complete, detailed and consistent, which, together with the circumstances surrounding their execution, compel the conclusion that they represent the truth * * *."

It appears clear to me that the Supreme Court of Illinois feels that Reck is in fact guilty of this horrible crime. The Court obviously realizes that Reck is a mentally retarded person whose sanity has been questioned on several occasions and who has now been in prison twenty-two years. Rather than turn this man loose upon society, the Court has chosen to dwell upon the details of his crime and to apply the classical test of exclusion which looks to *coercion in fact*. It seems to me the Court has therefore deliberately ignored the *totality* of circumstances test and the later decisions of the United States Supreme Court in order to avoid a distressing sociological problem involving the public safety.

However, I cannot thus rationalize away the test so well laid down by the United States Supreme Court for violation of the Due Process Clause.

The application of this test presents serious problems to the judge confronted with a case such as the one at bar. First, even if the judge is convinced that the person is guilty of the crime charged, he must release him if the total circumstances so warrant. This is difficult for the judge because it is on his conscience that any future crimes by that person must rest. I am reminded of Mallory v. United States, supra, where Andrew Mallory, guilty of a brutal crime, was released on a technicality and shortly thereafter committed another crime which caused the Washington Evening Star on January 6, 1958 to make this comment:

> "The real point, it seems to us, is that the law, as it has been interpreted by the courts, is too heavily weighted on the side of the criminal. The public, or society, or whatever descriptive term one may care to use, is entitled to some consideration, too. As matters stand, the public is not getting it. We do not know whether Mallory should be in jail or in a mental institution. But one thing is certain, he ought not to be roaming the streets of this city. And as long as he and others like him are on the loose, it would be well to keep the doors locked."

Certainly a judge owes a duty to society to apply the law impartially, but it seems monstrous when the discharge of such a duty results in endangering that same society. It cannot be denied that the rights of the individual must be pro-

tected, but can we not achieve civilized standards of procedure without the necessity of turning dangerous criminals loose upon society?

This crime occurred in 1936. It would be impossible for the State of Illinois to gather evidence to bring Reck to trial again at this time some 22 years later. Therefore, if Reck does go free, he will most certainly remain free, regardless of his guilt. I cannot ignore this practical element of the case by rationalizing, "It is better that ten guilty men should go free rather than one innocent man be condemned." This "maxim," in my opinion, is fallacious, since it places the price of ten guilty men on one innocent man, thus admitting that there is a limit over which an innocent man may be unjustly convicted without violating any principles of our philosophy. Thus, the "maxim" contradicts the "maxim." It is the ill-considered use of "maxims" such as this, supported by the misuse of such terms as "justice," "freedom" and "liberty" which often in reality lie at the heart of a decision with no thought to an analysis of the particular situation and the practical effect which results in an individual case from such a philosophy. It is the judge who must attempt a reconciliation at the price of disregarding the law, as I think the Supreme Court of Illinois has done in this case, or at the price of his conscience.

Reck was convicted of this crime in 1936 and at *that* time the Due Process Clause was not violated by the circumstances surrounding the making of his confession. Today, the Due Process Clause is violated. This situation will arise time and time again in courts throughout the United States and in many of those cases, as I believe the fact to be here, the person will be guilty of the crime charged. Upon his release, the state will not be able to convict him for that crime because of the time lapse which will destroy its evidence. This is an appalling problem which defies reason. Certainly, if a person has recently been arrested and upon trial or thereafter the *totality* of circumstances test

is applied and his confession suppressed, I am in complete accord since the state may prosecute that person again upon proper evidence still obtainable. This is in keeping with the philosophy of our accusatorial system. But that is *not* the case here.

It should also be noted *that every United States Supreme Court decision, cited supra, in the evolution of the Due Process Clause was decided in review of a state supreme court by Writ of Certiorari and not upon Writ of Habeas Corpus as here.* It is my opinion that social necessity requires a re-evaluation of the Due Process Clause in Habeas Corpus cases wherein the petitioner has been imprisoned throughout an era in which the Clause has undergone a changing interpretation.

The Supreme Court of the United States has recently stated in Bartkus v. People of State of Illinois, U.S.; 79 S.Ct. 676, 680:

"Decisions of this Court concerning the application of the Due Process Clause reveal the necessary process of balancing relevant and conflicting factors in the judicial application of that Clause * * * Decisions under the Due Process Clause require close and perceptive inquiry into fundamental principles of our society. The Anglo-American system of law is based not upon transcendental revelation but upon the conscience of society ascertained as best it may be by a tribunal disciplined for the task and environed by the best safeguards for disinterestedness and detachment."

The "relevant and conflicting factors" which I must try to balance in light of the "conscience of society" in the instant case are as follows:

(1) When Reck was convicted in 1936, neither the Supreme Court of the United States nor society felt that his rights under the Due Process Clause had been violated. Today, the same circumstances would result in a violation of that Clause:

(2) To release Reck now would be to free him forever from the guilt of this crime, since a retrial would at this time be next to impossible.

(3) Reck's confession was tested before a judge and jury who had the opportunity to observe witnesses and weigh other fresh evidence at first hand while I must make my decision on the basis of a cold and ancient record, which can appear misleading.

(4) I find, from the record, that the release of Reck from prison, may result in a danger to society due to his mental condition as revealed in the record and which 22 years in prison cannot have improved.

(5) The Supreme Court test for violation of the Due Process Clause must admit to a sound discretion on the part of the court in its particular application.

With these "factors" plainly before me, I now consider the "conscience of society." Certainly, the "conscience of society" favored the imprisonment of Reck. It is my opinion, based upon many expressions of public opinion such as the one appearing in the Washington Evening Star, supra, and upon my own personal experience of almost 20 years as a trial judge, that the "conscience of society" does not favor his release under the circumstances of the instant case.

As Justice Frankfurter so well said in Griffin v. People of State of Illinois, 351 U.S. 12, 25 and 26, 76 S.Ct. 585, 593, 100 L.Ed. 891:

"We must be mindful of the fact that there are undoubtedly convicts under confinement in Illinois prisons, in numbers unknown to us and under unappealed sentences imposed years ago, who will find justification in this opinion, unless properly qualified, for proceedings both in the state and the federal courts upon claims that they are under illegal detention in that they have been denied a right under the Federal Constitution. It would be an easy answer that a claim that was not duly asserted—as was the timely claim by these petitioners—cannot be asserted now. The answer is too easy. Candor compels acknowledgment that the decision rendered today is a new ruling. Candor compels the further acknowledgement that it would not be unreasonable for all indigent defendants, now incarcerated, who at the time were unable to pay for transcripts of proceedings in trial courts, to urge that they were justified in assuming that such a restriction upon criminal appeals in Illinois was presumably a valid exercise of the State's power at the time when they suffered its consequences. Therefore it could well be claimed that thereby any conscious waiver of a constitutional right is negatived.

"The Court ought neither to rely on casuistic arguments in denying constitutional claims, nor deem itself imprisoned within a formal, abstract dilemma. The judicial choice is not limited to a new ruling necessarily retrospective, or to rejection of what the requirements of equal protection of the laws, as now perceived, require. For sound reasons, law generally speaks prospectively. More than a hundred years ago, for instance, the Supreme Court of Ohio, confronted with a problem not unlike the one before us, found no difficulty in doing so when it concluded that legislative divorces were unconstitutional. Bingham v. Miller, 17 Ohio 445. In arriving at a new principle, the judicial process is not impotent to define its scope and limits. Adjudication is not a mechanical exercise nor does it compel "either/or" determinations.

"We should not indulge in the fiction that the law announced has always been the law and, therefore, that those who did not avail themselves of it waived their rights. It is much more conducive to law's self-respect to recognize candidly the considerations that give prospective content to a new pronouncement of

law. That this is consonant with the spirit of our law and justified by those considerations of reason which should dominate the law, has been luminously expounded by Mr. Justice Cardozo, shortly before he came here and in an opinion which he wrote for the Court. See Address of Chief Judge Cardozo, 55, Report of New York State Bar Ass'n, 263, 294 et seq., and Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 363–366, 53 S.Ct. 145, 148–149, 77 L.Ed. 360. Such a molding of law, by way of adjudication, is peculiarly applicable to the problem at hand. The rule of law announced this day should be delimited as indicated."

It is my opinion that, generally speaking, the Due Process Clause must likewise speak prospectively in Habeas Corpus cases with the emphasis upon the discretion of the individual district judge in each case. Historically, judges have always had a certain degree of discretion in cases of this nature. In England today, the trial judge may, in his discretion, admit a confession into evidence even though the Judge's Rules have been violated. R. v. May, 36 Cr. App.Rep. 91. The Supreme Court of the United States has recently recognized this principle in its approach to the problem of integration. It is my opinion that this same approach must be taken in cases such as the one at bar. A district judge, with the record before him, looking beyond the *total circumstances,* should not be bound absolutely by this test.

During my many years on the Bench, I have watched with great interest and satisfaction the vitalization of the Due Process Clause through Supreme Court interpretation. However, I have also been aware of the practical aspects of such interpretation as herein enumerated. I am convinced from the language of the Bartkus and Griffin cases, supra, that the United States Supreme Court is likewise aware of these problems. If, with great respect, I may conjecture, this might be the reason the Supreme Court denied Certiorari in the instant case.

Re-evaluating the Due Process Clause as used in Habeas Corpus cases wherein the petitioner has been imprisoned throughout an era in which the Clause has undergone a changing interpretation, it is my opinion, based upon the history of the Clause, the practical aspects of the problem and the recent pronouncements of the United States Supreme Court, that in each case, the *totality* of circumstances test must be weighed against the "relevant and conflicting factors" as interpreted by the "conscience of society" with the final decision resting in the sound discretion of the judge. Exercising such discretion to the best of my ability in the light of all the factors herein set forth,

I hold the Due Process Clause not violated in the instant case.

The writ heretofore issued is accordingly quashed and the Relator is remanded to the custody of the Respondent.