## THOMAS *v.* ARIZONA.

No. 88.   Argued March 4–5, 1958.—Decided May 19, 1958.

*W. Edward Morgan* argued the cause and filed a brief for petitioner.

*Wesley E. Polley,* Special Assistant Attorney General of Arizona, and *John G. Pidgeon* argued the cause for respondent.   With them on the brief were *Robert Morrison,* Attorney General, and *James H. Green, Jr.,* Chief Assistant Attorney General.

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner has been convicted of first degree murder and sentenced to death by an Arizona court for the killing of one Janie Miscovich.   He asks this Court to reverse his conviction on the ground that a confession received in evidence at his trial was coerced by fear of lynching, in violation of his rights under the Due Process Clause of the Fourteenth Amendment.

The victim, proprietor of a grocery store in Kansas Settlement, Arizona, was killed while tending her store on the evening of March 16, 1953.   No one witnessed the

crime, but strong circumstantial evidence indicated that it occurred between 10 p. m. and 11 p. m., and that petitioner was responsible. He was arrested the next day under circumstances which lend credence to his assertion of a "putative lynching." The confession at issue, however, was not made until the day following the arrest, when he was taken before a Justice of the Peace for preliminary examination.

After an initial determination of voluntariness, the trial judge in the Superior Court of Cochise County, Arizona, submitted the issue of coercion to the jury under instructions to ignore the confession as evidence unless it was found entirely voluntary. A general verdict of guilty was returned by the jury and accepted by the trial court. The Supreme Court of Arizona affirmed, 78 Ariz. 52, 275 P. 2d 408, and we denied certiorari.[1] 350 U. S. 950 (1956). Petitioner then made application for habeas corpus in the United States District Court for the District of Arizona. After reviewing the entire record, the District Court denied the writ without a hearing. The Court of Appeals

---

[1] The State contends preliminarily that petitioner failed to exhaust his state remedy before seeking habeas in the federal courts, because his application in this Court for certiorari to the state court was not timely. The normal rule that certiorari must be applied for here after a state conviction before habeas is sought in the District Court, *Darr* v. *Burford,* 339 U. S. 200 (1950), is not inflexible, however, and in special circumstances need not be complied with. *Darr* v. *Burford, supra,* at 210. "Whether such circumstances exist calls for a factual appraisal by the [District Court] in each special situation. Determination of this issue, like others, is largely left to the trial courts subject to appropriate review by the courts of appeals." *Frisbie* v. *Collins,* 342 U. S. 519, 521 (1952). Petitioner's failure to timely apply for certiorari was noted by the District Court in this case, but expressly was stated not to be the basis for its denial of habeas. Since that court and the Court of Appeals considered petitioner's application on the merits, we are not inclined at this late date to consider the procedural defect a fatal error.

affirmed, 235 F. 2d 775, and we granted certiorari because of the seriousness of petitioner's allegations under the Due Process Clause. 352 U. S. 1024. An exhaustive review of the record, however, impels us to conclude that petitioner's confession was "the expression of free choice," *Watts* v. *Indiana,* 338 U. S. 49, 53 (1949), and not the product of fear, duress, or coercion.

The prosecution's use of a coerced confession first led to this Court's reversal of a state conviction in *Brown* v. *Mississippi,* 297 U. S. 278 (1936). Our resolution of similar claims in subsequent cases makes clear that "the question whether there has been a violation of the due process clause of the Fourteenth Amendment by the introduction of an involuntary confession is one on which we must make an independent determination on the undisputed facts." *Malinski* v. *New York,* 324 U. S. 401, 404 (1945). No encroachment of the traditional jury function results, for the issue of coercion, unlike the basic facts on which coercion is ascertained, involves the application of constitutional standards of fundamental fairness under the Fourteenth Amendment. See *Brown* v. *Allen,* 344 U. S. 443, 507 (1953) (concurring opinion). In each instance our inquiry must weigh the "circumstances of pressure against the power of resistance of the person confessing." *Fikes* v. *Alabama,* 352 U. S. 191, 197 (1957), quoting *Stein* v. *New York,* 346 U. S. 156, 185 (1953).

We turn then to the undisputed portions of the record to ascertain the facts against which petitioner's claim of coercion must be measured.

## I.

Petitioner is an itinerant Negro laborer who lived with his common-law wife and four other Negroes, including one Ross Lee Cooper, a 17-year-old boy, in an old barracks provided by his employer about a half mile from the victim's store. Petitioner is a Navy veteran, 27 years

old at the time of the murder, with a partial high school education. He had a criminal record of three different convictions, the most serious being a five-year larceny sentence, as well as two terms in the Navy brig for twice being absent without leave from his service post.

The body of Janie Miscovich was found Tuesday morning, March 17. A supplier noticed smoke coming from the store and summoned the help of three men constructing a building nearby, one of whom was petitioner. Petitioner did nothing to assist in putting out the fire, and left the scene before the victim's body was discovered, declaring that he "never could stand the stench of burning flesh." Although the body was severely beaten and burned, death was attributed to knife wounds in the heart, inflicted with a large knife found later in the store.

Preliminary investigation by local police disclosed that petitioner and Cooper were at the store together Monday afternoon and evening. After they returned to the barracks at approximately 8:30 p. m., petitioner left again by himself, returning around midnight. A trail of blood and footprints was traced from the store to within 50 yards of the barracks, where a strip of freshly harrowed ground made further tracking impossible. Blood spots were found in the kitchen of the barracks, and two bloody gloves were found hidden near the barracks. Both gloves were for the right hand and one of them was slit across the middle, ring and little fingers. Matching gloves were found in the store, where nine pairs plus two gloves for the left hand remained out of 12 pairs of gloves stocked by Janie Miscovich on Monday. The only pair of shoes petitioner owned, found under his bed in the barracks, exactly matched the 13½-inch footprints trailed to the barracks. He had returned to the barracks after discovery of the fire and exchanged his shoes for a pair of old work boots he got "out of the trash pile."

## II.

A posse of 12 to 15 men headed by the Sheriff of Cochise County apprehended petitioner Tuesday at 3 p. m. lying under a pasture brush pile over 200 yards from the road and about 1½ miles from Kansas Settlement. Three fingers of his right hand had been severely cut, matching the slits in the bloody glove found outside the barracks.

Petitioner was placed under arrest by the Sheriff and handcuffed by a state highway patrolman with the posse. When asked by the Sheriff "why he had killed the woman," petitioner asserted that he had not killed her, but that he could take the posse to the man who had done so, accusing Cooper of the murder. He also stated that he had cut his hand on a can. At this point a local rancher on horseback, who had no official connection with the Sheriff's posse, lassoed petitioner around the neck and jerked him a few steps in the general direction of both the Sheriff's car and the nearest trees, some 200 yards away. The Sheriff quickly intervened, removed the rope, and admonished, "Stop that. We will have none of that . . . ." There was no talk of lynching among the other members of the posse.

The Sheriff then put petitioner and two other men in his car and drove a few miles south where petitioner directed him in search of Cooper. They found Cooper working in a field about half a mile off the road. The Sheriff borrowed a horse from a member of the posse— which had followed the Sheriff's car—and rode alone across the field to arrest Cooper. As he was bringing Cooper back to the car, a second rancher on horseback roped Cooper around the waist and led him along. When they reached the car, the Sheriff removed the rope. Petitioner, who had a full view of Cooper's apprehension,

got out of the car and identified Cooper as the Miscovich killer.

Cooper was handcuffed and standing beside petitioner when the rancher responsible for Cooper's roping lassoed both men, catching them either by their shoulders or their necks and pulling them down to their knees. The Sheriff, looking "kind of mad," reacted "immediately," removing the rope and shouting, "Hey, stop that. We will have no more of that." Two or three other men joined the Sheriff in protesting the third roping incident. No trees at all could be seen from the location of these last two ropings, and no mention or threat of lynching was heard.

By 4:30 p. m. both prisoners had been placed in the Sheriff's car. They were taken directly to Willcox, the nearest town with a Justice Court, for preliminary examination in compliance with Arizona law.[2] However, the judge, who was also a school bus driver, already had departed on the evening run. Before leaving Willcox, the Sheriff stopped briefly at the local mortuary, where the body of the murder victim was shown to both suspects. The prisoners then were taken to Bisbee, site of the county jail and courthouse. Arriving there after closing time of the nearest Justice Court, the Sheriff took them to nearby Warren for questioning by the County Attorney.

It was 6 p. m. when the Sheriff and his prisoners reached the home of the County Attorney, whom a prior injury had confined to a full body cast and stretcher. Petitioner and Cooper were placed together in a back bedroom under guard of an armed deputy, but each was

---

[2] "An officer who has arrested a person without a warrant shall without unnecessary delay take the person arrested before the nearest or most accessible magistrate in the county in which the arrest occurs, and shall make before the magistrate a complaint, which shall set forth the facts showing the offense for which the person was arrested." Ariz. Rev. Stat. Ann., 1956, § 13–1418.

separately quizzed for an hour in a front room. Petitioner was questioned solely by the County Attorney, though six other men, some of whom were armed, were present.[3] Petitioner was barefoot; his shoes had been seized as evidence in the case, and there were no shoes at the jail large enough to fit him. He wore the same coveralls in which he was arrested. The County Attorney first identified each man in the room, assured petitioner that no threats and no promises would be made, "explained to him his rights," and told him to tell the truth. No force was used or threatened against either prisoner. While petitioner's statement was never tendered in evidence at the trial, it was filed with the United States District Court in the habeas proceeding as proof of his composure on the very day of his arrest. The statement included petitioner's stout denial of any responsibility for the murder, and a detailed story designed to incriminate Cooper, a young and backward boy called "Baby John." [4] Petitioner claimed to have returned to the store with Cooper a second time the night before, and to have waited outside while Cooper entered the store to buy beer. Upon hearing screams, petitioner said he rushed inside, found Cooper holding a knife over the woman, cut his hand trying to seize the knife from Cooper, and then ran back to the barracks, leaving Cooper with the woman. He illustrated the story in some detail by tracing his movements with crayons on a diagram of the Miscovich store.

At 9 p. m., the Cochise County Under-Sheriff took petitioner to a hospital where his hand was treated, and

---

[3] The Sheriff, the Under-Sheriff, a court reporter, a police photographer, and two County Attorney's deputies.

[4] A young mother living in the barracks who sat up all Monday night with her sick child completely discredited petitioner's story by her unshaken testimony that Cooper never left the barracks again after returning with petitioner about 8:30 p. m.

at 10 p. m. left him at the county jail. Later the Sheriff stopped by petitioner's cell, but nothing was said aside from the Sheriff's inquiry as to "how he was feeling."

At 11:30 a. m. the next morning, Wednesday, March 18, the Sheriff brought petitioner before the Lowell Justice Court for preliminary examination. Petitioner was barefoot, and remained so until the Sheriff bought him a pair of shoes. Prior to leaving the jail for court, the Sheriff gave petitioner a pack of cigarettes. Upon further inquiry as to how he was feeling, petitioner complained of his hand injury, and the Sheriff said he would see that it was dressed again.

When petitioner arrived at the court, three other men were conducting business with the Justice of the Peace, delaying petitioner's hearing for five minutes until they finished and departed. Then, in the presence of the Sheriff, a Deputy Sheriff, and a female secretary, Justice of the Peace Frazier read the complaint to petitioner, advised him of his rights to preliminary hearing and to counsel,[5] told him the hearing could be waived, and instructed him that he could plead guilty or not guilty as he chose, but that a guilty plea would automatically waive the preliminary. Petitioner immediately replied with the oral confession in issue here: "I am guilty. I don't need any lawyer. I killed the woman." Judge Frazier asked if the murder was committed with an axe. Petitioner said, "No. I killed her with a knife."

Immediately thereafter, the Sheriff again took petitioner to the home of the County Attorney, where a

---

[5] Out of the jury's presence during the initial inquiry of the trial court into the coercion issue, Judge Frazier testified that he told petitioner the Superior Court would appoint an attorney for him, but that he said nothing about appointing an attorney himself for the preliminary examination in the Justice Court. Subsequently, testifying before the jury, he stated that petitioner was told of a "right to counsel before his preliminary in Justice Court."

detailed confession was made in the presence of the County Attorney, his secretary, the Sheriff, and a Deputy Sheriff. Just as he had the night before, the County Attorney identified those present and told petitioner that no threats or promises would be made. He also warned petitioner that the secretary would record everything said, and concluded, "You don't have to talk to me if you don't want to, but you can, if you will, tell me in your own words, in your own free will, just what took place out at Kansas Settlement." Later in the afternoon, after his return to the jail, petitioner was taken downstairs to the County Attorney's courthouse office, where in the presence of five people [6] he read through and signed the typed transcript of his confession at the County Attorney's home.

Either the next day, Thursday, March 19, or else Friday, March 20 (the record being inconclusive), a newspaper reporter visited petitioner in jail. At the trial he testified petitioner seemed nervous and afraid. Petitioner indicated that he'd been "roughed up" and that the Sheriff had saved his life. At the reporter's request, he posed for a picture with the Sheriff. Petitioner asked the Sheriff on Thursday to be moved to a part of the jail where he could be by himself, and the Sheriff said he would try to arrange it. On the same day, the Sheriff took petitioner to a doctor for additional treatment of his hand.

The third and last confession was taken down on Friday, March 20, in the County Attorney's office in the presence of seven men, including a Deputy United States Marshal.[7] After the same preliminary precautions as

---

[6] The Sheriff, two Deputy Sheriffs, a County Attorney's deputy, and the County Attorney's secretary.

[7] Others present were the Under-Sheriff, a Deputy Sheriff, the County Attorney, two County Attorney's deputies, and a court reporter.

preceded petitioner's statements Tuesday night and Wednesday afternoon, the County Attorney obtained a detailed confession. Several days later, on April 1, the Marshal met alone with petitioner and had him read the transcript of this last confession, telling him to initial the bottom of each page if, and only if, the material thereon was true. After an hour's reading, petitioner initialed all the pages.

The written confessions, signed on the 18th and the 1st, were found "procured by threat of lynch" and declared involuntary by the trial judge after his preliminary inquiry. Although the oral confession before the Justice of the Peace was made between the time of the ropings and the written confessions, the trial judge made an initial determination that it was voluntary. He justified this seeming incongruity on the basis of the different circumstances under which the oral statement was made, namely, the judicial surroundings and the presence of the Sheriff with only one other deputy, the Sheriff being "the very man who had protected [petitioner]."

### III.

Deplorable as these ropings are to the spirit of a civilized administration of justice, the undisputed facts before us do not show that petitioner's oral statement was a product of fear engendered by them. Arizona's determination that the written confessions were involuntary cannot control the separate constitutional inquiry posed by the character of the oral confession. And since ours is to be an independent resolution of the issue of coercion, the range of our inquiry is not limited to those factors which differentiate the oral from the written confessions. The inquiry to be made here, primary in both time and logic, is the voluntariness of the oral confession, which

was admitted into evidence. Consequently we do not consider the subsequent confessions.

Coercion here is posited solely upon the roping incidents. There is no claim and no evidence of physical beating, as in *Brown* v. *Mississippi,* 297 U. S. 278 (1936); of continuous relay questioning, as in *Watts* v. *Indiana,* 338 U. S. 49 (1949); of incommunicado detention, as in *Fikes* v. *Alabama,* 352 U. S. 191 (1957); or of psychiatric inducement, as in *Leyra* v. *Denno,* 347 U. S. 556 (1954). Petitioner is neither of tender age, as was the accused in *Haley* v. *Ohio,* 332 U. S. 596 (1948), nor of subnormal intelligence, as was the defendant in *Fikes* v. *Alabama, supra.* Nor, in view of his extensive criminal record, can he be thought an impressionable stranger to the processes of law.

The 20-hour interval between the time of the ropings and petitioner's oral confession was devoid of all coercive influences other than the sight of the victim's body.[8] No threats were made, no promises offered, no force used, and no intimation of mob action existent. Petitioner's own activity during the crucial 20 hours is eloquent rebuttal of the contention that he was a man dominated by fear. At the logical height of oppression, during the ropings themselves, petitioner stoutly denied the offense and attempted to put the police on the trail of Cooper. That very evening he reiterated

---

[8] Unlike many cases where this Court has found coercion, there apparently was no failure here to comply with the state statute requiring that a prisoner be taken before a magistrate without unnecessary delay after the arrest. Contrast, *e. g., Fikes* v. *Alabama,* 352 U. S. 191 (1957); *Watts* v. *Indiana,* 338 U. S. 49 (1949); *Malinski* v. *New York,* 324 U. S. 401 (1945); *Ward* v. *Texas,* 316 U. S. 547 (1942). The Arizona statute, see note 2, *supra,* was construed in *State* v. *Johnson,* 69 Ariz. 203, 211 P. 2d 469, where the accused apparently was not taken before a magistrate until the morning following his 5 p. m. arrest.

his position in a detailed story of Cooper's guilt and his own innocence, notwithstanding Cooper's presence with him in the same house. Even though petitioner appeared apprehensive and worried to a newspaperman two or three days after the oral statement, his demeanor both at the County Attorney's home the night of his arrest and before the Justice Court the next morning bespoke complete voluntariness to other witnesses, including Judge Frazier. Nothing in the undisputed record seriously substantiates the contention that a fear engendered by the ropings overbore petitioner's free will at the time he appeared in the Justice Court. His statement appears to be the spontaneous exclamation of a guilty conscience.

Petitioner relies heavily on the testimony of the state patrolman who was present at the first roping. He testified that when petitioner was first roped, the Sheriff said, "Will you tell the truth, or I will let them go ahead and do this." Petitioner argues that this testimony completely negates the Sheriff's role as petitioner's "protector," eliminating one of the two factors by which the trial judge distinguished the oral from the other confessions. The Sheriff, however, expressly denied making any such statement, and all other witnesses of the first roping agreed that no such threat ever was uttered. Whatever the merits of this dispute, our inquiry clearly is limited to a study of the *undisputed* portions of the record. "[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved [against petitioner] by the State's adjudication." *Watts* v. *Indiana,* 338 U. S. 49, 51–52 (1949).[9] Time and again we have refused

---

[9] The "[state] adjudication" upon which this rule turns is that of the trial judge in this case. While the general verdict of guilty is not instructive here as to the jury's view on the issue of coercion, the

to consider disputed facts when determining the issue of coercion. See *Gallegos* v. *Nebraska,* 342 U. S. 55, 60–61 (1951); *Haley* v. *Ohio,* 332 U. S. 596, 597–598 (1948); *Ward* v. *Texas,* 316 U. S. 547 (1942). The rationale behind such exclusion, of course, lies in the superior opportunity of trial court and jury to observe the witnesses and weigh the fleeting intangibles which may indicate truth or falsehood. We abide by the wisdom of that reasoning.

## IV.

Petitioner has an alternative prayer that his case be remanded to the District Court for a plenary hearing on the issue of coercion. There is no merit, however, to his contention that the District Court erred in denying the writ on the basis of the record without a full hearing. The granting of a hearing is within the discretion of the District Court, *Brown* v. *Allen,* 344 U. S. 443, 463–465 (1953), and no abuse of that discretion appears here.

Petitioner also urges that the District Court erred in considering the transcript of his interrogation in the County Attorney's home after his arrest. As stated above, that transcript never was made part of the record in the case. The State, however, filed it as an affidavit before the District Court. Petitioner asserts error because, in the absence of any hearing, he had no opportunity to rebut the affidavit. It does not appear, however, that petitioner made any objection in the Dis-

---

judge made an initial determination of voluntariness before submitting the confession to the jury. That preliminary finding occurred prior to the highway patrolman's testimony, but a motion for mistrial by defense counsel immediately after the conflict arose was denied before the case went to the jury. Therefore, we need not decide whether the mere fact of conviction, absent a more specific adjudication of voluntariness, would suffice to invoke the rule foreclosing assessment of the disputed facts.

trict Court, nor did he file any counter-affidavit. Moreover, the substance of the transcript—petitioner's denial of guilt and attempt to implicate Cooper just three hours after the ropings—appears at other places in the record. We fail to see how prejudice could have resulted.

*Affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN dissent.