Petition of William G. THOMPSON for a Writ of Habeas Corpus.
Civ. A. No. 1037–60.

United States District Court
D. New Jersey.
Feb. 24, 1961.

William G. Thompson, pro se.

WORTENDYKE, District Judge.

On December 14, 1960 William G. Thompson, a prisoner of the State of New Jersey by virtue of his conviction of crime in a Court thereof, filed with the Clerk of this Court a petition for a writ of habeas corpus, and deposited with said Clerk certain books and documents referred to as exhibits in the petition which has been referred to me for appropriate disposition.

The place of petitioner's confinement is the New Jersey State Prison Farm at Rahway, New Jersey, and he is in the custody of Warren Pinto, the Superintendent of that institution.

The petition discloses that on January 23, 1957 petitioner was convicted in the Passaic County Court upon an indictment charging that on or about July 27, 1956, in the City of Paterson, New Jersey, he did maliciously and without lawful justification, with intent to cause and procure the miscarriage of a woman then pregnant with child, unlawfully use in and upon her an instrument and instruments and means unknown, as a consequence whereof the woman died. This offense is violative of the provisions of N.J.S.A. 2A:87-1. Upon this conviction petitioner was sentenced to imprisonment for a term of not less than 12 nor more than 15 years. Subsequently the petitioner was convicted of the additional crime of conspiracy, an offense proscribed by N.J.S.A. 2A:98-1, for which he was sentenced to a term of from 2 to 3 years, to be served concurrently and retroactively with the sentence imposed upon him for the prior conviction. He has completed his service of the second sentence (from which he never appealed), but is still serving the prior sentence.

Petitioner further represents that he appealed his conviction on the abortion charge to the Appellate Division of the Superior Court of New Jersey, which reversed the judgment of the Passaic County Court. See State v. Thompson, App. Div.1959, 56 N.J.Super. 438, 153 A.2d 364. From this appellate reversal the State appealed to the New Jersey Supreme Court, which reversed the Appellate Division. See State v. Thompson, 1960, 31 N.J. 540, 158 A.2d 333. On March 28, 1960, the Supreme Court of New Jersey denied a rehearing. Copies of briefs and appendices in the appellate proceedings in both of the State courts have been furnished to me by the petitioner for perusal, and have been carefully examined.

On October 10, 1960 the Supreme Court of the United States denied Thompson's petition for a writ of certiorari to review the decision of the Supreme Court of New Jersey. 364 U.S. 848, 81 S.Ct. 92, 5 L.Ed.2d 72. The petitioner's application for that writ was based upon the contention that the pro-

visions of the New Jersey statute, for the violation of which the present petitioner was convicted, "grant immunity to prosecution of an indictment for abortion when the 'victim' performs an abortion upon herself, under the provisions of the Due Process Clause and the Equal Protection Clause of the 14th Amendment to the Constitution of the United States" and the New Jersey statute under which the conviction was had. In further support of the latter application, Thompson contended that "the State Courts (sic) refusal to acknowledge a defendant's evidence on appeal, when that evidence establishes the innocence of the defendant and proves that the circumstantial evidence that caused the conviction was deliberately fabricated, and the true facts would reverse the judgment— even though the fabricated evidence was not discovered until after conviction, violate the Due Process Clause of the 14th Amendment of the Constitution of the United States."

██ In the present petition for a writ of habeas corpus, the exhibits referred to therein, and submitted therewith, as well as the reports of the respective decisions of the Appellate Division of the Superior Court of New Jersey and the Supreme Court of New Jersey, it appears that the victim of the abortion had charged a married man with responsibility for her pregnancy and had threatened him that she would tell his wife unless he did something about the situation. There was evidence that the man in question disclosed his difficulty to Thompson, at whose suggestion a meeting was arranged with the pregnant woman, at her apartment during the nighttime, which both of the men attended, Thompson bringing with him a bag and a syringe. It further appeared that Thompson talked with the woman out of the other man's presence, and upon rejoining the latter, told him not to worry. Both of the men then departed. During the succeeding month the woman wrote to the man whom she had accused, advising that nothing had as yet transpired. She thereafter renewed her threats to complain to the man's wife unless something further was done. The man concerned relayed this information to Thompson, who undertook to talk with the woman again. A meeting was arranged by the accused man with Thompson and the woman, at Thompson's apartment. After admitting her, Thompson claimed that he then left for his place of business, although it was late in the evening, and that when he returned 15 or 20 minutes later, he found the woman in the bathroom, complaining of pain in the abdominal area. Almost immediately thereafter she lost consciousness. A woman friend of Thompson's was called to the apartment, some of the ailing woman's clothing which had been removed was replaced, and she was then taken to the entrance of her home. Shortly afterward she was admitted to a hospital, where she expired.

The present petitioner's defense to the indictment was based upon his contention that the woman aborted herself, and one of the critical aspects of the evidence related to the distance, in the case of an average woman, "from the opening of the vagina to the opening of the womb." It appeared on autopsy that there were perforations on the outside of the uterus, and it was the State's contention that the syringe or similar instrument which caused the perforations could not have been inserted by the victim herself, because it was not long enough to reach the location of the perforations. The defendant adduced no evidence upon the trial to refute the testimony of the autopsy physician, Dr. Denson, who stated that the distance from the opening of the vagina to the opening of the womb was 12 to 13 inches. However, upon his subsequent motion for a new trial the defendant, for the first time, as allegedly newly discovered evidence, presented the opinion of another physician, Dr. Hochman, who estimated that the distance between the two aforementioned female organs was not 12 to 13 but 3 to 4 inches. The foundation for Dr. Hochman's opinion was laid in the autopsy report and in an excerpt from Dr. Denson's testi-

mony upon the trial of the abortion indictment. On being shown a sample of the type of syringe which had been introduced upon the trial of the abortion indictment, Dr. Hochman estimated the length of the catheter thereof as between six and seven inches, and was permitted to express the opinion (after further confrontation by an excerpt from the transcript of Dr. Denson's testimony on the trial) that the instrument would be sufficient to reach to the location of the perforations on the uterus discovered on autopsy, and that the distance of 12 or 13 inches referred to by Dr. Denson would be an over-all distance to the top of the uterus, i. e., "the maximum length from the outside to the maximum point of the uterus itself." While the opinion of Dr. Hochman differed radically from that of Dr. Denson, there is not the slightest basis in the record for inferring that Dr. Denson committed perjury; or that the State exerted any influence whatsoever which may have resulted in the doctor's expression of that opinion; or that Dr. Hochman had not been available to testify for the defendant; or that any influence was exerted by the State to prevent his being called as a witness for that purpose. The petitioner has submitted to this Court a volume entitled "Atlas of Human Sex Anatomy," 2d Ed., by Dickinson, and referred this Court to figure 13 therein, which petitioner contends discloses that the vagina is from 6 to 7.5 c.m. in length. Assuming that any disclosure, textual or graphic, contained in the volume presently submitted to this Court with the pending petition, indicates that Dr. Denson's testimony was erroneous, there has been no showing that such disclosure was not available for use during the trial upon the cross-examination of the State's medical witness. Nowhere in the pending petition or in the supporting record can I discern any basis for inference that the judicial discretion invoked by the petitioner upon his application for a new trial was abused. Therefore, the denial of a new trial cannot serve as a foundation for the peti-

tioner's present contention that he was deprived of his constitutional rights. A contention similar to that which he makes here was asserted by the petitioner in his reply brief, on appeal from his conviction to the Appellate Division of the Superior Court of New Jersey. That Court directly reviewed the trial evidence and concluded (56 N.J.Super. 438, 442, 153 A.2d 364, 367) "that under the authority of State v. Siciliano, 21 N.J. 249, 121 A.2d 490 (1956), there was sufficient proof to enable a jury to find that Thompson perpetrated the crime. We have no doubt that this is so, particularly in view of the medical proof that it was improbable that the victim could have herself inflicted the internal wounds which were found on autopsy. If the question presented dealt only with the weight of the evidence, we would unhesitatingly affirm the conviction." Petitioner contends, and it is obvious to the writer of this opinion, that the distance from the location of the puncture wounds upon the uterus to the labia of the vagina was of critical importance to the defense; but all of the evidence upon which the petitioner relied to support his motion for a new trial, as well as his present petition, had been available to him for presentation upon the trial. His failure to present it at that time may not be cured here. Neither does the defendant's asserted personal ignorance of the anatomical facts at the time of the trial entitle him to relief in the present proceeding. Evidence offered on a motion for a new trial which merely tends to impeach or contradict evidence which has been presented on the trial, does not suffice to justify a new trial, especially where, as here, the subsequently offered evidence could have been discovered before the trial by the exercise of due diligence. State v. Haines, 1956, 20 N.J. 438, 120 A.2d 118; State v. Richter, 1956, 21 N.J. 421, 122 A.2d 502. It is not the function of this Court upon a writ of habeas corpus to review issues which have been directly presented and decided in a former pro-

ceeding. Cobb v. Hunter, 10 Cir., 1948, 167 F.2d 888.

■ Petitioner next impugns the testimony of the State's witness, John P. Brady, a toxicologist, in two respects. From the fact that this witness was occasionally referred to, during the trial of the abortion indictment, as "Doctor" Brady, coupled with the fact that upon the subsequent conspiracy trial the same witness disclaimed his right to the title of "Doctor", petitioner contends that the weight of the witness' testimony was intentionally and unwarrantedly distorted by the State to the prejudice of the defendant. Mr. Brady is known to the writer of this opinion, as a result of his having testified in numerous cases over a span of many years, as an eminent toxicologist. His educational and professional background is impressive, and upon more than one occasion, to this writer's knowledge, has evoked from courts, as well as from examining and cross-examining attorneys, the appellation of "Doctor". It was disclosed to the jury on the trial of the abortion case that Mr. Brady was a graduate chemist, and a mechanical engineer, who had pursued post-graduate studies at Brooklyn Polytechnic Institute, New York University, City College of New York, Columbia University, Rutgers University, and Massachusetts Institute of Technology. Upon his examination as a witness, he was generally addressed as "Mister" Brady. The appellation "Doctor" was employed with respect to Mr. Brady principally during the course of examination or cross-examination of other witnesses. No prejudicial misrepresentation may be inferred from such facts, nor could such a circumstance spell out an intentional misrepresentation imputable to the State. No objection by petitioner was made to any question to a witness in which Brady was referred to as a doctor, and therefore, no reviewable error was preserved, nor is any harmful error apparent upon the record. In passing upon the present petition, this Court may not supercede the functions of an appellate tribunal.

The second aspect of petitioner's criticism of the testimony of Mr. Brady is to be found in the comparison which the petitioner would have this Court draw from the record of the testimony of the witness upon the trial of the abortion indictment and that given by him during the subsequent conspiracy trial. Petitioner represents that "Brady testified that he took scrapings from the base of a piano, seeking flesh particles, hair or blood. * * * That he took fibers from a rug at the base of the piano and tested them for blood; that he tested a mattress and that he tested the bathroom. He also testified to the length and distance between two parallel cuts found on the right forehead of the victim." Thus petitioner summarizes the Brady testimony on the abortion trial. With this he compares the testimony of the same witness upon the subsequent conspiracy trial, which he says was to the effect that Brady "did not take any scrapings from the piano; he did not take fibers from the rug at the base of the piano; he did not test the mattress and he did not test the bathroom, but 'looked around for gross bleeding', which he defined as 'pools of blood'. He admitted that he had never seen the body of the victim, but had testified to the length and distance between the two cuts on the forehead of the victim, after seeing a photograph of the victim." All of the activities to which Brady testified during the abortion trial were, according to the petitioner, corroborated by the testimony of Detective Sergeant Peter Ventimiglia. Because of the seriousness of the accusation of perjury made by the petitioner against Mr. Brady and Detective Sergeant Ventimiglia, we have scanned the record of the Brady testimony on both trials with great care. Brady testified on the abortion trial that he "made an examination and took scrapings from many stains that I saw on that piano, and all the fibers that I found thereon I also recovered and brought back to the laboratory. In other parts of the house I did look to check the possibility of stains, either present or that may have been wiped and left there,

residual marks. \* \* \* The scrapings from the piano leg and fibers from the particular area, including those about the sofa in the region of the leg, was no human blood or no blood of any type, and all the fibers were not of human origin." On the conspiracy trial the same witness testified that he found "scrapings from the piano legs, fibers from that area, and fibers recovered in that area, scrapings, were negative for human blood. They were particularly the resin and varnish of the piano legs. They were the fibers that would come from that area during sweepings and vegetation that lies in and about the floor." It is obvious that there is no substantial conflict in the testimony of this witness on these trials. Mr. Brady was also asked on the abortion trial whether, on July 30, 1956, when he took the scrapings from the piano leg, he examined anything else in the apartment and he answered "At that particular time, no." During the conspiracy trial, the same witness was asked whether he made some careful examinations of various parts of the defendant's apartment, including the bathroom. He responded to this inquiry in the affirmative but stated that he saw no blood on the toilet. Asked with respect to his examination of a mattress in the apartment, he denied making any careful examination thereof, but stated that he observed no gross bleeding upon it. No date was mentioned in connection with the examinations referred to in this testimony. The testimony of Detective Sergeant Ventimiglia that Mr. Brady, in his presence, examined the apartment, the bathroom and living room, the piano and piano leg, and generally observed conditions therein, is utterly barren of any basis for suspicion of perjury on the part of either of the named witnesses, much less of a foundation for petitioner's charge that the State knowingly introduced perjurous testimony violative of petitioner's constitutional rights.

■■ The law which I deem applicable to the present pending petition for writ of habeas corpus is clearly and comprehensively restated by Judge Barnes of the Ninth Circuit, in Muhlenbroich v. Heinze, 1960, 281 F.2d 881, at page 883, as follows:

"It is clear that a federal district judge may dismiss a habeas corpus petition of a state prisoner without hearing when, as a matter of law, the facts alleged in the petition do not constitute grounds for relief in a federal court. Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, \* \* \* ; 28 U.S.C. § 2243. However, when it is not possible to dispose of the petition on purely legal grounds, the court must determine 'by examination of the record whether or not a hearing would serve the ends of justice.' Brown v. Allen, supra, \* \* \*, 344 U.S. at page 464, 23 S.Ct. at page 411. While in general a petitioner is entitled to a hearing when issues of fact must be resolved, Walker v. Johnston, 1941, 312 U.S. 275, 61 S. Ct. 574, 85 L.Ed. 830, this is not necessary when a state court has already adjudicated the factual issue adversely to the petitioner. In such cases a federal district judge may rely on state court adjudication of fact, and, in his discretion, direct his inquiry only to whether the state court adjudication is without vital flaw. Thomas v. State of Arizona, 1958, 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863; Brown v. Allen, supra."

Upon the petition before this Court, and the exhibits referred to therein, and submitted therewith, as well as upon the record of the prior related proceedings, I find, as a matter of law, that the facts alleged in the petition do not constitute grounds for the relief sought, and that a hearing thereon would not serve the ends of justice.

■ I further conclude that the State Court adjudications of fact are without vital flaw. The accusations of perjury and withholding of evidence have not been brought home to the prosecution of the criminal offenses, and the failure of

the State to introduce into evidence the preserved uterus of the abortion victim (of which petitioner also complains) does not constitute a withholding of evidence prejudicial to him, since the article was in court during the abortion trial and available for introduction by the defendant had he chosen to make such use of it.

For the reasons stated, the petition for writ of habeas corpus is dismissed. It is accordingly so ordered this 24th day of February, 1961.