Herbert SMALLWOOD, Appellant,

v.

WARDEN, MARYLAND PENITEN-
TIARY, Appellee.

No. 10205.

United States Court of Appeals
Fourth Circuit.

Argued April 6, 1966.

Decided Sept. 26, 1966.

Haynsworth, Circuit Judge, dissented.

Abel J. Merrill, Baltimore, Md.
(Court-assigned counsel) [Gordon, Fein-
blatt & Rothman, Baltimore, Md., on
brief], for appellant.

Fred Oken, Asst. Atty. Gen. of Mary-
land (Thomas B. Finan, Atty. Gen. of
Maryland, on brief), for appellee.

Before HAYNSWORTH, Chief Judge,
and BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

A judgment of conviction with a sen-
tence of life imprisonment for murder
was passed October 1, 1953 upon Herbert
Smallwood, on a jury verdict in the Cir-
cuit Court of Charles County, Maryland.
No appeal was taken, but vacation of the
conviction and sentence was sought in
the State courts through statutory reme-
dies [1] and petitions for habeas corpus,
all to no avail.[2] Thereupon he petitioned
the Federal district court in Baltimore
on January 2, 1964 for habeas corpus.

The grievance Smallwood mainly
presses is the reception in evidence at
trial, over his counsel's objection, of his
oral confession. The incriminating
statements are alleged to have been in-
duced through psychological pressure, in-
cluding the suggestion of relief of mind.
This illegality is said to have tinged the
trial and thus robbed it of due process.
The District Court after a plenary hear-
ing found the confession voluntary and
denied the writ. Smallwood appeals.

Since the District Court's decision,
Davis v. State of North Carolina, 384
U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895

---

1. Uniform Post-Conviction Procedure Act,
art. 27 § 645A et seq., 3 Annotated Code
of Maryland (1957).

2. Smallwood v. Warden, 231 Md. 652, 191
A.2d 244 (1964).

(June 20, 1966) on certiorari from this court, has come down. The Supreme Court there took the facts as found and accepted by the lower courts and drew a contrary ultimate inference from them— "that the confessions were the product of a will overborne". The opinion noted that the Court had the duty to "make an independent determination of the ultimate issue of voluntariness". Following this procedure-prescription enjoined upon us, on assaying the facts as found by the District Judge we think they disclose an invalidating involuntariness in Smallwood's confession.

The facts, completely and fairly stated by the District Court, were these:

"Clarence Wheeler, who operated a saloon a short distance from the house where Smallwood and his brother Robert lived, was beaten to death in the early morning of May 17, 1953, in the living quarters behind the saloon. The place was then ransacked and set afire.

"Sergeant Walter Wilt of the Maryland State Police (then a trooper) began investigating the murder at 6:40 a. m. on May 17. He learned that a Luger automatic pistol and some money had been taken from the ransacked premises. He obtained a description of the pistol from the man who had sold it to Wheeler.

"While Wilt was at the scene of the crime, he was given a tip by an informer who had previously provided reliable information leading to the solution of a murder case. The informer told Wilt to check on Herbert Smallwood, and Wilt began to develop information about Smallwood's activities. Wilt knew that Smallwood had a criminal record and had recently been discharged from a penal institution. He learned that Smallwood had been drinking during the previous evening and had been seen around midnight at a tavern in the community where Wheeler and Smallwood lived. Wilt also learned that Smallwood had had a T-shirt washed at his sister's home on the morning after the murder.

"Having developed these facts, Wilt, with Lieutenant Brown, Trooper Coleman, Deputy Sheriff Cox and State's Attorney Barbour, went to the house [about 2 P.M. on May 17] which Smallwood occupied with his brother Robert, who was also a suspect. As they approached the house, Smallwood came out, walking toward them; upon seeing the officers, he went behind the house, but shortly reappeared around the corner of the house and walked toward them. While the other men approached Smallwood, Deputy Sheriff Cox searched behind the house, found a Luger pistol, and brought it to the group in front of the house. Smallwood was arrested and taken to the police car, where the officers noticed certain stains on his shoes. They searched his shoes and found $83, including two blood-stained twenty-dollar bills, which were introduced in evidence at the trial.

"A cap which Smallwood said belonged to his brother Robert had been found at or near the scene of the crime, so Robert also was arrested. The brothers were taken to the office of the State's Attorney in the Charles County Court House and questioned there by Wilt, Coleman, Cox and Barbour for approximately four hours.

"On May 18 the questioning was renewed at approximately 9:00 a. m. It continued until 4:00 p. m., with a break around noon for lunch. At 4:00 p. m. Smallwood was taken back to the County Jail, given food and allowed to rest. The police noted certain discrepancies in the stories of Smallwood and his brother Robert, and suggested to them that they take lie detector tests. Both men indicated that they were willing. At 7:00 p. m. Smallwood was placed in a police car with his brother, Wilt, Coleman, Cox and Sheriff Cooksey and taken to Washington. Smallwood knew that he and his brother were being taken to Washington for the purpose of having the lie detector tests taken. Dur-

ing the trip, which lasted about an hour and a half, there was little or no questioning. The brothers were taken to the Metropolitan Police Headquarters in Washington about 8:30 p. m., where they were questioned further by the officers until 12:15 a. m. on the 19th. At that time Smallwood was placed in the custody of Detective James K. McCarty of the Washington police, who asked Smallwood certain preliminary questions and then gave him a lie detector test after Smallwood had signed a statement indicating that he had been advised of his constitutional rights and was taking the test voluntarily.[4]

"At the conclusion of the test, Smallwood was told that he was lying about certain key elements of the crime and that he should tell the truth. He replied that 'the machine had the answers and that should be enough'. At about 2:00 a. m., after further questioning by McCarty, Smallwood stopped denying that he was involved in the crime and told McCarty that he did not have any recollection of the murder because he was too drunk to remember. McCarty informed him that he had to have a recollection because otherwise the lie detector would not have registered physical reactions to certain questions. McCarty asked Smallwood if he would like to speak to one of the Maryland policemen and if he would feel more like telling the truth to them. Smallwood indicated that he would like to talk with Trooper Wilt, stating that he had been treated very nicely by him. McCarty called Wilt in and told Smallwood that Wilt was the officer in charge of

the case, whom Smallwood 'would have to look to, to handle the case for him in Maryland', and that Smallwood should tell him the truth. McCarty left the room while Wilt talked to Smallwood for about 20 minues.

"Wilt testified at the trial that after the lie detector test he told Smallwood that 'in view of what the machine had shown, and in view of how he must feel, with a crime in his heart, and on his mind, . . . that if he could but get that off his heart, off his mind, he would feel better'. Smallwood asked Wilt what more they wanted when the machine had the answers. Wilt told him that they would like a statement from him, and when Smallwood indicated to Wilt that he would make a statement Wilt called McCarty back into the room. At that time Smallwood admitted being solely responsible for the crime, but still insisted that there were certain things about the case that he could not recollect.

"After this statement, McCarty asked Smallwood if he was willing to tell the story to the other Maryland officers and Smallwood agreed. McCarty called Cooksey, Cox and Coleman into the room, and Smallwood made a statement very similar to the one that he had just made to McCarty and Wilt.

"At the request of McCarty, Smallwood agreed to tell the story to his brother, and he stated in his brother's presence that he was solely responsible for the crime and that he was sorry. McCarty asked Smallwood to tell his brother how he had been treated from the time he was arrested 'until the

"4. Smallwood testified in this Court that during the lie detector test McCarty told him 'he should have his head beat in like the dead man did'. As noted above, Smallwood is not a credible witness. He did not testify to any threats when he was on the stand during the trial while the Court was considering the admissibility of the oral confessions out of the presence of the jury. McCarty testified at the trial that no threats had been made

to Smallwood. His brother testified at the hearing in this Court that during the period he was being questioned by the police no one had threatened him at any time. No doubt during the lie detector test there was some discussion about the nature of the crime, but this Court finds the evidence insufficient to show that any threats were made to Smallwood." [Other footnotes have been omitted because deemed unnecessary.]

present', and Smallwood said that he 'had been treated as good as gold'.

"Wilt then asked Smallwood if he would be willing to give a written statement to the same effect as the oral statement he had just made, and Smallwood agreed to do this. However, once the written statement was started, Smallwood indicated to the officers that he did not wish to continue and that he did not want to sign a statement which set forth the facts he had already told them.

"The questioning in Washington was completed sometime between 4:00 and 5:00 a. m., and Smallwood was taken back to Charles County. On the afternoon of the 19th he signed a statement prepared by Wilt to the effect that he had been well treated during his interrogation, that he had not been offered any rewards or promises, and that he had not been threatened in any way.

\*　\*　\*　\*　\*　\*

"Mudd [F. DeSales Mudd, Esq., counsel appointed by the State court to defend Smallwood] testified at the hearing in this Court that he had been disturbed at the trial by Smallwood's apparent lack of concern. He therefore requested a psychiatric examination before sentence. Dr. Manfred S. Guttmacher conducted such an examination on September 2, 1953. Dr. Guttmacher concluded:

'This young colored boy is very seriously defective intellectually and can probably best be classed as a low grade moron. \* \* \*

'This patient has sufficient intellectual capacity to know the difference between right and wrong and realize the nature and consequences of his acts. Our examination suggests that he is an amoral individual and functions at a very primitive level. There is evidence of strong aggressive, antisocial drives which apparently he keeps under poor control. No doubt, his capacity to control these is further reduced by the use of alcohol.

'In this examiner's opinion this patient is a seriously defective delinquent who is a real danger to society. If our law recognized the principle of partial responsibility, his mental deficiency might well be considered a mitigating circumstance. However, from a social point of view it increases his potential malignancy; and in consequence, it would certainly seem an unnecessary risk to release this man in the community, at any time in the foreseeable future.'

"The clinical psychologist who also examined Smallwood agreed with Dr. Guttmacher that Smallwood's intelligence was very defective. In his report he stated:

'The character structure brought out by the tests is crude, immature, and basically inadequate. His reactions are likely to be impulsive in the extreme, with no attempt at self-discipline. Several of his interpretations of the Roschach inkblots have a quality of violence; thus on Card II he sees 'a cat with his head cut off,' with 'blood running from the neck,' and on Card III, a human head with a 'blood spot' next to it. This man is quite lacking in any moral principles that would restrain him from aggressive antisocial acts, and there is a strong prospect of violence in his behavior. Only considerations of immediate expediency would act as a deterrent.

'The general impression is of a mental defective with an extremely primitive, hostile character makeup, capable of a great deal of violence and lacking in any motivation to conform to social norms.'"

Abridged, these findings reveal that:

(a) Smallwood was interrogated while in the constant custody of the police, for 4 hours on the afternoon of May 17, 1953; after detention overnight, beginning at 9 a. m. he was questioned for 6 hours during the forenoon and afternoon of May 18, with a lunch break at noon and suspension at 4 p. m. for rest and

food; at 7 p. m. he was taken to Washington, D. C., a trip lasting approximately one and one-half hours, and then subjected immediately to further questioning, including the lie detector test, which continued throughout the night, until about 4 or 5 a. m.;

(b) Smallwood submitted to the "lie detector" test, at the conclusion of which he was told by the operator of the device that "he was lying", with apparent reference to the indications of the machine.

(c) Smallwood's mental capacity, authoritatively diagnosed, was "seriously defective", classified as low grade or high grade moron. Although not in the findings, undisputed testimony disclosed that Smallwood was 23 years old at the time of the offense, a tobacco farm laborer with a 5th grade education and able to read only simple words.

■ Design for decision here has been laid out in Davis v. State of North Carolina, supra, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); and Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); they uncompromisingly dictate rejection of Smallwood's confession. The context in which his statements were uttered is there declared by the Supreme Court as inherently and almost conclusively imputing overbearance of the declarant's volition and will. Admittedly, while the circumstances in the cited cases were more coercive, the instant confession cannot escape the condemnation taught by those decisions. Reiteration of their facts would add nothing here. Our concern is their thesis: that, to be admissible, the confession must be "the product of an essentially free and unconstrained choice".

■ The facts here fail to demonstrate this theorem, even owning the necessary inexactness of legal proof. Coercion of the utterer lurks within them. The scene was not one where his silence or speech, disavowal or avowal, was a ready option. At least the record does not confer that conviction. Without it we cannot honor the confession, and we do not.

As the admission of this evidence at trial deprived the defendant-petitioner of due process, we must vacate the judgment and sentence passed upon him. To this end we reverse the order of the District Court denying Smallwood's petition. The case will be remanded with directions that Maryland be allowed a reasonable opportunity to retry Smallwood, failing which the District Court shall issue its writ of habeas corpus for his release from custody under the indictment. Nothing we have said, however, shall preclude the State from holding Smallwood for or under such civil proceedings and process as may be provided by its laws for the detention of persons found to be dangerous to the public safety, as the medical testimony in this case describes Smallwood.

Reversed and remanded.

HAYNSWORTH, Chief Judge (dissenting):

Smallwood was convicted in 1953. Under the standards then prevailing, there is no question but that his confession was not involuntary and was properly admissible. If the Supreme Court had taken the case on direct review, it would have affirmed the conviction.[1]

Some eight to ten years after Smallwood's conviction, the Supreme Court began to apply more stringent standards.[2]

1. Thomas v. State of Arizona, 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863; Ashdown v. State of Utah, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443; Crooker v. State of California, 357 U.S. 433, 78 S. Ct. 1287, 2 L.Ed.2d 1448; Cicenia v. La-Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed. 2d 1523. These cases were decided in 1958, well after a direct appeal in this case would have reached the Supreme Court.

2. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513; Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895.

Moving responsively to a sense of need to develop effective protections against oppressive police practices, evolving standards for the resolution of the involuntariness question were applied with an increasing exactness. Finally, those standards have been supplemented and, to a large extent displaced, by *Miranda's*[3] new standards. *Miranda* is not to be applied retroactively to this case,[4] and the principal question on this appeal is what standard is to be applied in answering the question of involuntariness. That standard is not so uncertain in its general verbal formulation; our difficulty arises out of the practical necessity to determine the dimensions of the rule by which we are to measure the conduct of the police in this case.

If the gauge is cut to the dimensions prescribed in the most recent pronounce-ments of the Supreme Court, there were some indicia of coercion. The length of the interrogation is the principal one, but the confession does not appear to have been its product. The confession was the direct and immediate result of his belief that the lie detector had revealed his falsehoods and disclosed the truth.[5] He had consented to that test. He had sought no outside assistance, but nothing had been done or said to create in him the impression that he could not have done so had he wished. After the confession, he told his brother he "had been treated as good as gold."

On the whole record, the circumstances are far milder than those in any case in which the Supreme Court has found a confession involuntary,[6] to overturn the

3. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

4. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

5. Smallwood's actions during the questioning and shortly thereafter do not indicate that his will was broken by overbearing police. Until after the lie detector test, he stoutly denied his guilt. The extensive questioning, even against the background of incriminating physical evidence, did not cause him to waver. He uttered not a word to link himself to the crime. His prior dealings with the police were standing him in good stead. His consent to take the lie detector test was made in a noncoercive atmosphere, after a three-hour rest period during which he had been fed. His desire to take the test, beat it and thus secure his release, seems clear enough, but when faced with its negative results he almost immediately implicated himself. This indicates that his confession was the product of the results of the lie detector test, fairly rendered, and not here claimed to have been coercive. That he was not induced to talk by the length of the interrogation or any overbearing was reemphasized by Smallwood's action subsequent to the two oral confessions. At first, he agreed to dictate a statement to the officers, and sign a transcript of it, but just after this procedure began he changed his mind and refused to proceed. He was not a malleable toy doing anything the police want-ed. Later, the next afternoon, when the effect of any imagined coercive practices had dissipated, he signed a statement that he had not been abused or mistreated in any way.

6. Without close comparison of the facts in the relevant Supreme Court cases with those in this case no conclusion can rest upon a firm foundation. An assumption that after *Davis*, the slightest pressure to speak is impermissible and unlawfully coercive, regardless of when it was exerted and under what circumstances, is unwarranted. "The nature and components of this problem, concerning as it does liberty and security, had better be overtly and critically examined than smothered by unanalyzed assumptions." Culombe v. Connecticut, 367 U.S. 568, 578, 81 S.Ct. 1860, 1865.

Through the years it has been recognized that the police may use a certain amount of pressure, yet be free of unlawful coercion. As late as 1964 it was said with some validity that

"a fairly high degree of pressure may be applied before the [Supreme] Court will term the confession 'involuntary.' The rulings of the Court buttress such a conclusion. It has held that the use of certain psychological pressure tactics for a limited time does not require exclusion of a resulting confession. The police may illegally detain the accused, fail to warn him of his rights, or deny him access to counsel without necessarily overbearing his will." Spanogle,

District Court's finding here, the majority applies a still narrower gauge, for the conflicting inferences which the record supports are disregarded and the relatively mild indicia of coercion are accepted as conclusive. No case in the Supreme Court has commanded that approach. No case in the Supreme Court "dictates" an appellate finding of coercion here.

If the gauge is cut to the pattern of earlier Supreme Court cases, the confession was not even arguably coerced. In 1953, there was no decision, or group of decisions, in the Supreme Court which can be said to have foreshadowed proscription of the procedures followed by the police in this case.[7]

The Use of Coerced Confessions in State Courts, 17 Vand.L.Rev. 421, 428.

*Miranda* has changed much of that, but we deal with pre-*Miranda* standards.

Nothing appears in the treatment of Smallwood to rival that received by Davis, Haynes, or Culombe. I need not now stop to detail the facts in those cases, but each was subjected to infinitely greater pressure than was Smallwood. Each of them understood that the police intended to extract a confession, regardless of its truth, and each finally succumbed to the pressure that was applied.

In contrast, Smallwood obviously believed that his detention would soon end after he beat the lie detector. That belief may prove Smallwood's stupidity, but it is inconsistent with a theory of meek submission to the mounting pressures of extended interrogation. Here, too, the police are not easily cast in a villainous role. They carried out their duties as they knew them in 1953. They did nothing which they then had any reason to believe was an impropriety.

*Culombe* begins with the premise that questioning is not to be limited to an ineffective formal ceremony presided over by the suspect. "[W]hatever reasonable means are needed to make the questioning effective must be also conceded to the police." Despite the effect *Miranda* will have upon cases tried subsequent to its decision, the language of *Culombe* is still highly relevant to the decision of coercion issues in pre-*Miranda* cases.

7. No coercion was found in Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, decided in 1953, where the Court said:

"Both Stein and Cooper confessed only after about twelve hours of intermittent questioning. In each case this was stretched out over a 32-hour period, with the suspect sleeping and eating in the interim. In the case of Cooper, a substantial part of this time he spent driving a bargain with the police and the parole officers. It also is true that the questioning was by a number of officers at a time and by different officers at different times. But we can-

not say that the use of successive officers to question these petitioners for the periods of time indicated is so oppressive as to overwhelm powers of resistance. While we have reversed convictions founded on confessions secured through interrogations by 'relays,' we have also sustained convictions when, under different circumstances, the relay technique was employed. But we have never gone so far as to hold that the Fourteenth Amendment requires a one-to-one ratio between interrogators and prisoners, or that extensive questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited.

" * * * *

"Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

"Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler."

Also, in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, decided in the same year, the illiterate petitioner was held after arrest for five days before being charged with the crime, and eighteen days before he was given a preliminary hearing. During the entire period he was without counsel's aid. Yet the conviction withstood the scrutiny of the Supreme Court.

There was none of the "pressure of unrelenting interrogation" directed at Smallwood which the Court condemned in Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949). In that case Watts was arrested on November 12, 1947 and became a suspect for murder. He was questioned in relays by officers from about 11:30 that night until 3:00 o'clock the following morning. The same procedure of persistent interrogation from about 5:30 in the afternoon until about 3:00 o'clock the following morning, by a relay of six to

In *Johnson*[8] the Supreme Court has clearly recorded its intention not to require the retrial of prisoners whose confessions were secured under procedures sanctioned by doctrine current at the time of trial or not forbidden by the reasonable implications of decisions then available for the governance of police conduct. If the police carefully observed the rules as reasonably understood in 1953, the burden of retrial ought not now in this belated collateral proceeding be cast upon the state, nor the risk of Smallwood's release be cast upon the innocent public.

Smallwood is a violent man. His motivation is so primitive and poor that the psychiatrists agree that under the influence of alcoholic drink, he can be expected to become homicidal again. He is unquestionably guilty of the crime of which he was convicted; his confession was clearly truthful.

Such considerations are irrelevancies if his conviction was constitutionally infirm when the judgment was entered. Current astuteness in the protection of individual rights is not at odds with the interests of a society which places high values upon liberty and justice and freedom and fairness. It is the cornerstone of such a society. If one innocent suffers harm which an authoritarian society might have avoided, millions of individuals are assured of protection of their rights and of their dignity. But there was no such infirmity in Smallwood's conviction, for all agree that in 1953 it was unassailable. The question then arises of the values which should govern judgment in the dubious application, thirteen years later, of a shortened standard to compel the release of this undeserving man of violence upon defenseless individuals when retrial may be impossible because of the unavailability of witnesses and civil commitment, the plaintive suggestion of the majority, highly uncertain.

Smallwood's conditional release cannot correct any mistake the police made thirteen years ago. If the officers involved are still on active duty, today's decision will not assist their understanding of their duty. What we say adds nothing to *Miranda's* guidelines; they undermine them, for we inform police officials that, if they observe *Miranda's* standards today, we may censure them for it tomorrow.

While today's decision can make no positive contribution to police procedures in the future, it undermines what little finality there is in criminal judgments. This runs counter to the Supreme Court's course in *Johnson* in which the desirability of finality in criminal judgments comporting with current constitutional standards is recognized. It is not fair to the states or to the public to vacate judgments as old as this one on the basis of evolving constitutional standards which could not have been reasonably anticipated by the police at the time they acted.

An appraisal of the values which influence our judgment point clearly toward affirmance. The principle of *Johnson* seems to me to require it.

For these reasons, I respectfully record my dissent.

---

eight officers, was pursued on the 13th, 14th, 15th, 17th, and 18th, when Watts finally broke. During the entire time he was given little food and less sleep. Between questioning sessions he was placed in "the hole." See also Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810, and Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815, decided concurrently with *Watts*. In both *Turner* and *Harris* there was relay questioning and incommunicado detention of over five days' duration.

These were the cases which the police in 1953 had available for their guidance, Stein v. People of State of New York and Brown v. Allen showing what was permissible and how extensive interrogation might be, *Watts*, *Turner* and *Harris* showing what was impermissible. The police here were well within the *Stein* and *Brown* limits.

8. Johnson v. State of New Jersey, 384 U.S. 719, 731, 733, 86 S.Ct. 1772.